UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VICTORIA WASHINGTON, on behalf of her minor son, J.W., <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL J. ASTRUE, COMMISSIONER OF the SOCIAL SECURITY ADMINISTRATION, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) <br><br> CIVIL ACTION NO. 10-10416-DPW |

MEMORANDUM AND ORDER
September 20, 2011

Plaintiff Victoria Washington appeals the final decision of

the Commissioner of the Social Security Administration (the

"Commissioner"), denying her minor son, J.W.,[1] Supplemental

Security Income ("SSI") benefits.  After consideration of the

record, which I find provides substantial evidence for the

denial, I will affirm the Commissioner's decision.

## I.  BACKGROUND

### A.  *Psycho-Educational Background*[2]

J.W. was nine years old when he was diagnosed with attention

deficit hyperactivity disorder ("ADHD").  (Tr. 202.)  Due to this

---

[1]  The parties have identified J.W., a minor child, by his
initials in accordance with Local Rule 5.3(a)(2).

[2]  Mrs. Washington does not dispute the Commissioner's
finding that J.W. does not suffer from any severe physical
impairments.  Accordingly, the description of the medical history
contained in this section is limited to evidence pertaining to
his psycho-educational conditions.

impairment, J.W. repeated first and third grades and was placed in a special education program.  (Tr. 28, 216.)

Starting in September 2006 through March 2007, Kenyatta Etchison, M.S., a treating psychologist, provided counseling to J.W. to help him cope with his disability.  (Tr. 197-253.) During a counseling session, Mrs. Washington reported to Mrs. Etchison that J.W. had "difficulty staying on task, concentrating, and following directions both at school and at home."  (Tr. 208.)  Consistent with this statement, Mrs. Etchison confirmed that J.W. sometimes experienced difficulties in remembering basic instructions.  (Tr. 210.)  She also noted that J.W. often got into fights with his peers.  (Tr. 203, 212.) Despite these observations, Mrs. Etchison rated J.W.'s overall psychological functioning, known as Global Assessment of Functioning ("GAF") in December 2006,[3] as being in the "moderate"

[3]  The Global Assessment of Functioning ("GAF") evaluates overall psychological functioning on a scale of 0-100 that takes into account "psychological, social, and occupational functioning."  AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV-TR"), at 32 (4th ed. rev. 2000). For instance, a GAF in the range of 21 to 30 reflects a behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment" or "inability to function in almost all areas"; of 31 to 40 indicates "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood"; of 41 to 50 reflects "[s]erious symptoms" or "any serious impairment in social, occupational, or school functioning"; of 51 to 60 indicates "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning"; of 61 to 70 reflects "[s]ome mild symptoms" or "some difficulty in social,

range.  (Tr. 214.)  She stressed, however, that J.W. needed "support in effectively managing peer conflict and decreasing impulsive behavior, especially at school."  (Tr. 215.)

Mrs. Etchison reported that, following J.W.'s placement in a special education program in December 2006, he was doing "better" at school and "was able to focus and complet[e] an art project." (Tr. 242.)  Despite these encouraging observations, Mrs. Etchison downgraded J.W.'s GAF level to "major impairment in many areas" in January 2007, finding that he had a "tendency to react impulsively in social situations."  (Tr. 335.)  Less than two months later however, Mrs. Etchison again upgraded J.W.'s GAF level to "moderate," on the basis that he had demonstrated an "increased ability to effectively manage peer conflict" and had reported "increased academic success in school."  (Tr. 248-53.)

In the interim, two psycho-educational evaluations were conducted to assess the school performance of J.W.  The first was conducted in November 2006 by Allen Cohen, Ph.D., a school psychologist.[4]  (Tr. 157-67.)  Mr. Cohen found that J.W.

---

occupational, or school functioning," but "generally functioning pretty well, [with] some meaningful interpersonal relationships." *Id.* at 34.

[4]  Mr. Cohen refers in his report to a previous psycho-educational evaluation conducted by Kristin L. Fortin, a school psychologist, in June 2006, prior to the onset date.  (Tr. 157, 165.)  During her evaluation of J.W., Mrs. Fortin found J.W.'s performance to be in the "Below Average" range and to rank in the 4th percentile. (*Id.*)  She noted, however, that there was a significant discrepancy between the verbal and non-verbal scores,

performed below average "in all the areas assessed," but was near average in math computation, math reasoning skills, and listening comprehension. (Tr. 165.)  J.W. obtained his lowest scores in reading comprehension and spelling.  (*Id.*)  The second psycho-educational evaluation of J.W. was conducted by Lynn Cattanach, Ph.D., a licensed psychologist, in March 2007.  (Tr. 264-69.)  The results of this evaluation described J.W. as having "Borderline to Low Average range cognitive functioning" and ranking in the 7th percentile.  (Tr. 268.)  During the evaluation, Mrs. Cattanach observed that J.W.'s "behavior was often disorganized, off-task, hyperactive, inattentive, and distractible," but that "he was engageable in focused, time-limited tasks."  (Tr. 264.)  She also noted that J.W.'s "ability, despite his ADHD, to do academic-related activities [was] intact, given appropriate services, including individualized attention."  (Tr. 268.)  In light of these observations, Mrs. Cattanach attributed to J.W. a GAF level of 55, indicating that his symptoms were "moderate."  (*Id.*)

To provide a further basis for evaluating the severity of J.W.'s disability, Adam Koneman, his fifth grade teacher, submitted in June 2009 a report designed to evaluate J.W.'s performance and behavior at school.  (Tr. 154.)  Mr. Koneman

---

suggesting that attentional difficulties may have lowered his scores on the non-verbal tasks.  (*Id.*)

stated that J.W. participated in class lessons and activities, but was "most successful when there [was] a high degree of structure in place." (*Id.*) He reported that J.W. completed assignments, joined in discussions, and sought assistance when needed, but that he could sometimes disturb lessons by making side comments to other students. (*Id.*) Further, Mr. Koneman observed that, although J.W. had negative social interactions with his peers during lunch or recess, he was "receptive to reminders to seek out help from teachers to deal with these situations." (*Id.*) As to J.W.'s academic achievement, Mr. Koneman stressed that J.W. had improved his "mathematics solving skills and basic fact recall." (*Id.*) Finally, he reported that J.W. was "receptive to help when he [did] not understand a concept and [thereafter] complete[d] his assignment accurately." (*Id.*)

Along the same lines, Cynthia Batista, Ph.D., a clinical fellow in psychology, and Jean Wilkinson, Ph.D., a licensed psychologist, submitted in August 2009 a psychological evaluation of J.W. (Tr. 337.) In this report, they described J.W. as being "very impulsive" and expressing "his anger in the form of physical aggression when he fe[lt]. . . verbally provoked by peers." (*Id.*) Notwithstanding this behavior, Mrs. Batista and Mr. Wilkinson found that J.W. was "not overly fidgety" and had "shown the ability to follow through with treatment planning when

he work[ed] through options for appropriate responding in session." (*Id.*)

## B.  *Procedural History*

### 1.  Application of SSI Benefits

On October 4, 2006, Mrs. Washington applied for SSI benefits on behalf of J.W.  (Tr. 87-93.)  The application was denied at the initial level of review on April 6, 2007.  (Tr. 54-55.)  The denial rested upon the opinion offered by Dr. Marsha Tracy, M.D., an Agency consultant, based on her review of J.W.'s record.  (Tr. 270-75.)  Dr. Tracy opined that J.W.'s impairment did not meet, medically equal, or functionally equal the listed impairments. (Tr. 270.)  In relevant part, Dr. Tracy found this impairment resulted in "less than marked" limitations in the functional domains of acquiring and using information, and interacting and relating with others, and gave rise to "marked" limitations in the domain of attending and completing tasks.  (Tr. 272.)

On appeal, a Federal Reviewing Official denied the application, also concluding that J.W. did not meet, medically equal or functionally equal the listed impairments.  (Tr. 60-62.) The denial on appeal rested upon the opinion of Dr. Dora Logue, M.D., another Agency consultant, based on her review of J.W.'s

file.  (Tr. 328-30.)  Dr. Logue concurred[5] with the opinion of
Dr. Tracy.  (Tr. 329-30.)

2.  The ALJ's Hearing

Upon Mrs. Washington's request, the Administrative Law
Judge, Joel F. Gardiner, (the "ALJ") held a hearing on June 17,
2009.  (Tr. 20-53.)  At the hearing, Mrs. Washington, her son,
and Dr. Jay Orson, a medical expert, testified.   While Mrs.
Washington was informed of her right to representation, she chose
to testify without the assistance of an attorney or other
representative.  (Tr. 22-23.)  Because the medical record failed
to contain any documentation prior to 2007, the ALJ expressly
allowed the record to remain open for two weeks or longer
provided a request for extension of time was filed within that
time period.  (Tr. 24, 52.)

At the hearing, Mrs. Washington testified that her son had a
learning disability and had been placed in a special education
program. (Tr. 27-28.)  She stated J.W. had sought counseling in
2007, but had discontinued treatment due to domestic violence
issues at home.  (Tr. 30-33.)  At the time of the hearing, J.W.
was about to graduate from fifth grade and to enter sixth grade.
(Tr. 28-29.)  When asked by the ALJ about her son's performance

_____

[5]  Dr. Logue's finding as to J.W.'s impairment in attending
and completing tasks is unclear from her report. (Tr. 329-30.)
On the first page of that report, Dr. Logue indicated that J.W.'s
impairment was "less than marked," but suggested on the second
page that it was "marked."  (*Id.*)

during that year, Mrs. Washington stated that "he did pretty well," meaning that "[h]is behavior was rocky, but his academics was [*sic*] much better." (Tr. 29.) She conceded that, while the special education program had helped her son, his behavior remained problematic. (Tr. 36.) Due to his misbehavior, J.W. had been expelled from school "two or three times." (Tr. 37.)

For his part, J.W. testified at the hearing that his performance at school was "[k]ind of good and not so good." (Tr. 38.) He struggled in some subjects, but did "good" in mathematics. (Tr. 39.) As to his social interactions, J.W. conceded having friends, with whom he enjoyed playing basketball, but nevertheless admitted that he sometimes got into fights with his peers. (Tr. 39-40.) He also stated that he had not received counseling for some time, but expressed a desire to seek treatment again. (Tr. 42-43.)

Lastly, Dr. Jay Orson, a medical expert, testified at the hearing. (Tr. 43-52.) Based on his review of the medical record at the time and the testimonies provided during the hearing, Dr. Orson concluded that J.W.'s impairment did not meet, medically equal or functionally equal the listed impairments. (Tr. 45-50.) In particular, Dr. Orson found that J.W.'s impairment resulted in "less than marked" limitations in the functional domains of acquiring and using information, attending and completing tasks,

and "marked" limitations in the domain of interacting and relating with others. (Tr. 49-50.)

    <u>3.</u>   <u>The ALJ's Decision and Appeal</u>

On October 9, 2009, the ALJ issued a decision concluding that J.W. is not disabled under section 1614(3)(c) of the Social Security Act. (Tr. 7-19.) In reaching this conclusion, the ALJ found that J.W.'s impairment did not meet, medically equal or functionally equal the severity of the listed impairments. (Tr. 11-18.) In relevant parts, the ALJ found that J.W. suffered from "less than marked" limitations in the functional domains of acquiring and using information, and attending and completing tasks, and from "marked" limitations in the domain of interacting and relating with others. (Tr. 12-15.) The ALJ's decision was affirmed by the Decision Review Board on January 14, 2010. (Tr. 1-3.)

## II.   STATUTORY FRAMEWORK

### A.  *Standard of Review of the Commissioner's Decision*

The Social Security Act authorizes judicial review of social security disability determinations. *See* 42 U.S.C. § 405(g); 42 U.S.C. § 1383(c)(3). Pursuant to the Act, the reviewing court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see*

*also* 42 U.S.C. § 1383(c)(3) ("[T]he final determination of the Commissioner . . . shall be subject to judicial review as provided in section 405(g)").

The decision of the Commissioner must be upheld when "supported by substantial evidence," 42 U.S.C. § 405(g), but not "when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts," *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam). The Supreme Court has defined "substantial evidence" to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). "Sufficiency, of course, does not disappear merely by reason of contradictory evidence." *Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181, 184 (1st Cir. 1998).

**B.    *Standard for Child Entitlement to SSI Benefits***

In order to be entitled to SSI benefits, an individual under the age of eighteen years old must be "disabled" within the meaning of the Social Security Act. 42 U.S.C. § 1382c(a)(3)(C)(i). The term "disability" refers to "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.*

10

In making a child disability determination, the Social

Security regulations provide a three-step sequential analysis:

> First, the ALJ considers whether the child is engaged in 'substantial gainful activity.' Second, the ALJ considers whether the child has a 'medically determinable impairment that is severe,' which is defined as an impairment that causes 'more than minimal functional limitations.' Finally, if the ALJ finds a severe impairment, he or she must then consider whether the impairment 'medically equals' or . . . 'functionally equals' a disability listed in the regulatory 'Listing of Impairments.'

*Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting 20

C.F.R. § 416.924(a)-(d)).  An impairment "meets" the listings

"when it satisfies all of the criteria of that listing."  20

C.F.R. § 416.925(c)(3).  By contrast, an impairment "equals" a

listed impairment when "it is at least equal in severity and

duration to the criteria of any listed impairment."  20 C.F.R. §

416.926(a).  In order to "functionally equal the listings," a

minor's impairment "must result in 'marked' limitations in two

domains of functioning or an 'extreme' limitation in one domain."

20 C.F.R. § 416.926a(a).

An impairment results in "marked" limitations when it

"interferes seriously with [the child's] ability to independently

initiate, sustain or complete activities" or when standardized

testing designed to measure ability or functioning in a

particular domain yields "a valid score that is two standard

deviations or more below the mean, but less than three standard

deviations."  20 C.F.R. § 416.926a(e)(2)(i) & (iii).  Likewise,

an impairment results in "extreme" limitations when it "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities" or when standardized testing designed to measure ability or functioning in a particular domain yields "a valid score that is three standard deviations or more below the mean."  20 C.F.R. § 416.926a(e)(3)(i) & (iii).  The six domains of functioning contemplated by the regulations are (i) acquiring and using information, (ii) attending and completing tasks, (iii) interacting and relating with others, (iv) moving about and manipulating objects, (v) caring for oneself, and (vi) health and physical well-being.  20 C.F.R. § 416.926a(b)(1).

### III.  DISCUSSION

This appeal raises the question whether substantial evidence supports the ALJ's finding that (A) J.W.'s impairment does not meet or medically equal a listed impairment, or (B) that this impairment does not functionally equal the listings.  Another issue is whether (C) newly introduced evidence warrants remand.

### A.    *The ALJ's Finding that J.W.'s Impairment Does Not Meet or Medically Equal the Listings*

Mrs. Washington argues that the ALJ ignored record evidence by concluding that J.W.'s impairment does not meet or medically equal the listed impairments.

Pursuant to the Social Securities regulations, the required level of severity for ADHD is met when both the "A" criteria and

the "B" criteria are satisfied. 20 C.F.R. Pt. 404, Subpt. P,
App. 1, § 112.1. The "A" criteria demands medically documented
findings of marked inattention, marked impulsiveness, and marked
inactivity. *Id.* For its part, the "B" criteria requires that at
least two of the appropriate age-group criteria set forth in 20
C.F.R. Pt. 404, Subpt. P, App. 1, § 112.02(B)(2) be present. *Id.*
For a child of three to eighteen years of age, the age-group
criteria include marked impairment in age-appropriate
cognitive/communicative function, marked impairment in
age-appropriate social functioning, marked impairment in
age-appropriate personal functioning, and marked difficulties in
maintaining concentration, persistence, or pace. 20 C.F.R. Pt.
404, Subpt. P, App. 1, § 112.02(B)(2).

In concluding that J.W.'s impairment does not meet or
medically equal any listed impairment, the ALJ found that the
record does not contain any evidence of marked inattention,
marked impulsiveness, and marked hyperactivity, and that no
treating, examining or reviewing source of record has indicated
that the child met or medically equaled any listed impairment.
(Tr. 11.)

To defeat the ALJ's findings of fact, Mrs. Washington contends
that the record is *a contrario* replete with evidence of marked
inattention, impulsiveness, and hyperactivity. As to inattention,
Mrs. Washington points principally to the 2006 observations of Mrs.

13

Juliana Jones,[6] J.W.'s third grade teacher, which indicate that

J.W. "seems to have difficulty . . . sustaining attention during

tasks and play activities." (Tr. 159.) However, these

observations do not establish that J.W.'s impairments constitute

marked inattention. To be sure, Mrs. Washington places great

weight on the rating "marked atypical" assigned by Mrs. Jones to

J.W.'s "cognitive problems/inattention." (Tr. 164.) This rating

is, however, inconsistent with Mrs. Jones' observations that J.W.

"demonstrates *slightly serious* inattentive behaviors in the

classroom." (Tr. 159 (emphasis added).) In addition, a more

recent report of Mr. Koneman, J.W.'s fifth grade teacher, indicates

that, while J.W. sometimes requires redirection, he is nevertheless

able to complete school assignments, thereby suggesting that J.W.'s

inattention is not marked.[7] (Tr. 154.)

As to impulsiveness, Mrs. Washington relies upon the

observations made by Mrs. Etchison, J.W.'s treating psychologist

from September 2006 through March 2007. Regardless of whether Mrs.

---

[6] The observations of Ms. Juliana Jones are contained in the psychoeducational evaluation of Allen Cohen, Ph.D. (Tr. 157-67.)

[7] Mrs. Washington also argues that J.W.'s marked inattention is supported by the Federal Reviewing Official and Dr. Tracy's finding that J.W. suffered from a marked limitation in attending and completing tasks. (Tr. 61, 272.) This argument is unconvincing because both the Federal Reviewing Official and Dr. Tracy found that J.W.'s impairment does not meet or medically equal the listed impairments. (Tr. 60, 270.) In any event, the Federal Reviewing Official's decision is not itself evidence.

Etchison constitutes an acceptable medical source,[8] her

observations are not inconsistent with the ALJ's findings of fact.

To be sure, Mrs. Etchison never opined as to whether J.W.'s

impairment met or medically equaled the listings.  The only

observation she made regarding J.W.'s impulsiveness was that he had

a "tendency to react impulsively in social situations," leading her

to assign a GAF level of "major impairment in many areas" in

January 2007.  (Tr. 335.)  Less than two months later however, she

increased the GAF level of J.W. to "moderate," on the basis that he

had demonstrated an "increased ability to effectively manage peer

conflict" and had reported an "increased academic success in

school."  (Tr. 250-53.)  Accordingly, Mrs. Etchison's notes do not

support a finding that J.W.'s impulsiveness meets or medically

equals the listed level of impairment.  The ALJ's failure to

discuss Mrs. Etchison's observations is not ground for remand.  *See*

*N.L.R.B. v. Beverly Enters.-Mass.*, 174 F.3d 13, 26 (1st Cir. 1999)

---

[8]  The parties disagree as to whether Mrs. Etchison
constitutes an acceptable medical source.  Mrs. Washington argues
that Mrs. Etchison's notes are entitled to treating source weight
because these notes were co-signed by her supervisor, Dr. Jessica
Roth, M.D.  By contrast, the Commissioner contends that, even
assuming Dr. Roth's co-signature is legible, Mrs. Etchison's
notes cannot constitute an acceptable medical source because her
notes do not contain any evaluation by Dr. Roth and it is unclear
whether Dr. Roth is part of an interdisciplinary team as required
by the regulations.  *See* 20 C.F.R. Pt. 404, Subpt P., App. 1,
§ 112.00(D)(3) ("A report of an interdisciplinary team that
contains the evaluation and signature of an acceptable medical
source is considered acceptable medical evidence rather than
supplemental data").

("An ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party."). Equally unpersuasive is Mrs. Washington's reliance on the report submitted by Mrs. Batista and Mr. Wilkinson in August 2009. (Tr. 337.) Again this report did not purport to offer an opinion as to whether J.W.'s impulsiveness met or medically equaled the listings. The observation that J.W. is "very impulsive" and expresses "his anger in the form of physical aggression when he feels he is verbally provoked by peers" is insufficient to demonstrate otherwise. (*Id.*)

Finally, Mrs. Washington contends that the ALJ ignored record evidence that demonstrates marked hyperactivity. It is undisputed that the record contains some signs of hyperactivity. For instance, Mrs. Cattanach reported that J.W.'s behavior was often "disorganized, off-task, hyperactive." (Tr. 264) But the severity of these signs is not of a magnitude sufficient to establish that J.W. suffered from marked hyperactivity. Despite these difficulties, Mrs. Cattanach noted that "he was engageable in focused, time-limited tasks." (*Id.*) Accordingly, she attributed to J.W. a GAF level of 55, indicating that his symptoms were "moderate." (Tr. 268.) Consistent with this assessment, Mrs. Batista and Mr. Wilkinson reported that J.W. was "not overly fidgety" during sessions and was able to "follow through with treatment planning." (Tr. 337.)

For these reasons, I find the ALJ reasonably concluded that the record contains no evidence of marked inattention, marked impulsiveness, and marked inactivity as such.  (Tr. 11.) Substantial evidence supports the ALJ's conclusion that J.W.'s impairment does not meet or medically equal the listed impairments.[9]  (*Id.*)  This conclusion is fully consistent with the opinions offered by Dr. Orson, the medical expert, Dr. Tracy, and Dr. Logue.  (Tr. 45-49, 270, 329.)

**B.    *The ALJ's Finding that J.W.'s Impairment Does Not Functionally Equal the Listings***

Mrs. Washington argues that the ALJ erred in concluding that J.W.'s impairment does not functionally equal the listings.  In particular, she challenges the ALJ's finding of a "less than marked" impairment in two functional domains: (1) acquiring and using information, and (2) attending and completing tasks.[10]

1.    Acquiring and Using Information

In evaluating the level of impairment in "acquiring and using information," consideration must be given to how well the child acquires or learns information, and how well the child uses

---

[9]   Having found that the "A" criteria regarding the level of severity of attention deficit hyperactivity disorder was not satisfied, I need not discuss the "B" criteria.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.11.

[10]   Because Mrs. Washington challenges only the ALJ's finding as to "acquiring and using information," and "attending and completing tasks," the present analysis will be limited to these two functional domains.

the information he has learned.  20 C.F.R. § 416.926a(g).  A

school-age child (between six and twelve years old) "should be able

to learn to read, write, and do math, and discuss history and

science."  20 C.F.R. § 416.926a(g)(2)(iv).  A child of that age

will need to use these skills in academic situations to demonstrate

what he has learned (e.g., by reading about various subjects and

producing oral and written projects, solving mathematical problems,

taking achievement tests, doing group work, and entering into class

discussions).  *Id*.  A child of that age should also "be able to use

increasingly complex language (vocabulary and grammar) to share

information and ideas with individuals or groups, by asking

questions and expressing [his] own ideas, and by understanding and

responding to the opinions of others."  *Id*.  The ALJ found that

J.W. has "less than marked" limitations in this domain.  (Tr. 13.)

Mrs. Washington argues that the ALJ's finding on this issue is

erroneous because it rests upon the conclusion that J.W. had not

been diagnosed with a learning disorder.  This argument misses the

point.  The question for the ALJ was not whether J.W. had a

learning disability, but instead whether his impairment resulted in

marked or extreme functional limitations in acquiring and using

information.  Even assuming that J.W. suffers from a learning

disorder,[11] the existence of that disorder is insufficient in

_____

[11]  The Federal Reviewing Official, as well Dr. Tracy and
Dr. Logue, all listed "learning disorder" as one of the
impairments suffered by J.W.  (Tr. 60, 270, 329.)  By contrast,

itself to demonstrate marked or extreme limitations in that domain.
*See J.B. ex. Rel. Barboza v. Astrue*, 738 F. Supp. 2d 260, 266 (D.
Mass. 2010) ("that [the child] suffers from a learning disorder . .
. does not in itself serve as evidence of a marked or extreme
limitation.").

Moreover, a finding of "less than marked" limitations in the
domain of acquiring and using information is corroborated by the
opinion of Dr. Orson, the medical expert, as well as that of Dr.
Tracy and Dr. Logue. (Tr. 49-50, 272, 329.) This finding is
consistent with the fact that J.W. performs to an acceptable level
in areas other than reading and writing. For instance, Mr. Cohen,
a school psychologist, reported in November 2006 that, although
J.W. had performed below average "in all the areas assessed," his
performance was near average in math computation, math reasoning,
and listening comprehension. (Tr. 165.) In addition, Mr.
Koneman, J.W.'s fifth grade teacher, stated in June 2009 that J.W.
had improved his mathematics solving skills and basic fact recall.
(Tr. 154.) Along the same lines, Mrs. Washington testified at the

---

Mrs. Batista and Mr. Wilkinson observed that while J.W.'s
Individualized Education Program (IEP) reports "indicate that he
has a learning disability and has received special resources . .
., the specific disability is not stated." (Tr. 337.)
Consistent with this view, the reports of Mrs. Etchison do not
state *per se* that J.W. was diagnosed with learning disorder, but
instead only mention attention deficit hyperactivity disorder.
(Tr. 196-253.)

hearing that her son had done "pretty well" during fifth grade and was to enter sixth grade in the fall.  (Tr. 28-29.)

   For these reasons, substantial evidence supports the ALJ's finding that J.W.'s impairment in acquiring and using information is "less than marked."  (Tr. 13.)

   2.   Attending and Completing Tasks

   Assessing the level of impairment in the functional domain of attending and completing tasks involves considering how well the child is able to focus and maintain his attention, and how well the child begins, carries through, and finishes his activities including the pace at which he performs activities and the ease with which he changes them.  20 C.F.R. § 416.926a(h).  A school-age child (between six and twelve years old) "should be able to focus [his] attention in a variety of situations in order to follow directions, remember and organize [his] school materials, and complete classroom and homework assignments."  20 C.F.R. § 416.926a(h)(2)(iv).  A child of that age should also "be able to concentrate on details and not make careless mistakes in [his] work."  *Id.*  Finally, the child "should be able to sustain [his] attention well enough to participate in group sports, read by [him]self, and complete family chores."  *Id.*  The ALJ found that J.W. has "less than marked" limitations in this domain.  (Tr. 14.)

Mrs. Washington argues, in challenging the ALJ's finding in this domain, that the ALJ erred in departing, without any explanation, from the conclusion of the initial level of review and the Federal Reviewing Official, that J.W. suffers from a "marked" limitation in attending and completing tasks. In particular, she contends that at a minimum the ALJ was required, but failed, "to explain in detail" why he "agrees or disagrees with the substantive findings and overall rationale of the [Federal Reviewing Official]." 20 C.F.R. § 405.370(a).[12]

Although the ALJ did not explicitly acknowledge the contradictory findings on J.W.'s ability to attend and complete tasks, his decision provides sufficient grounds for concluding that J.W. has a "less than marked" impairment in this domain. For instance, the ALJ specifically noted that Dr. Orson, the medical expert, supports that conclusion. (Tr. 14.) He also considered the testimony of J.W. at the hearing, stating that he was able to sustain the attention and focus required to watch television and play hand-held video games. (*Id.*) Finally, the ALJ relied on J.W.'s teachers reports, which indicated that he had "obvious," but not "serious" problems sustaining attention in class. (Tr. 278.)

---

[12] Although 20 C.F.R. § 405.370(a) was amended and the above language was removed on May 3, 2011, I apply the regulation as it appeared at the time the decision of the ALJ was issued.

A finding of less than marked limitation in attending and completing tasks is further corroborated by other evidence of record submitted contemporaneously to the hearing. For instance, this finding is consistent with the report of Mr. Koneman, J.W.'s fifth grade teacher, who indicated that J.W. participated in class lessons and activities, and was able to complete assignments. (Tr. 154.) It is also consistent with the report of Mrs. Batista and Mr. Wilkinson, which stated that J.W. had "shown the ability to follow through with treatment planning when he work[ed] through options for appropriate responding in session." (Tr. 337.) Although J.W. has some obvious difficulties in attending and completing tasks, none of the physicians who have examined the child have found this impairment to result in a "marked" inability in this domain. These opinions are entitled to more weight than those of physicians who have *not* examined J.W. *See* 20 C.F.R. § 404.1527(d)(1) ("Generally, we give more weight to the opinion of a source who has examined [the child] than to the opinion of a source who has not examined [that child].").

Substantial evidence supports a finding that J.W. had a "less than marked" limitation in his ability to attend and complete tasks, and more generally that J.W. did not functionally meet the listings. *See Crespo v. Astrue*, No. 08-10846, 2009 WL 1459691, at *6-7 (D. Mass. May 26, 2009) (affirming the Commissioner's

decision notwithstanding the fact that the ALJ had not specifically addressed the opinion of a physician, Dr. Logue, that the child had a marked impairment in his ability to interact and relate with others).[13]

## C.    *Sixth-Sentence Remand*

Lastly, Mrs. Washington argues that the existence of new and material evidence warrants remand under 42 U.S.C. § 405(g), a relief known as the "sixth-sentence remand."

Section 405(g) provides in relevant part that "[t]he court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  42 U.S.C. § 405(g).  The Supreme Court has explained that the "sixth-sentence remand" is only "appropriate when the district court learns of evidence not in existence or available to the claimant at the time of the administrative proceeding that might have changed the outcome of that proceeding."  *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990); *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d

---

[13]    Mrs. Washington contends that the proper remedy is reversal, not a mere remand, because there is overwhelming evidence to support the conclusion that J.W. suffers from marked limitations in two functional domains.  Having found that substantial evidence supports the ALJ's conclusion that J.W. does not meet, medically equal or functionally equal the listings, I reject this argument.

136, 139-40 (1st Cir. 1987). In this case, the purportedly "material" evidence consists of an Individualized Education Program (IEP) report for the period of December 2008 through December 2009 (the "2008 IEP"), an IEP report for the period of December 2009 through December 2010 (the "2009 IEP"), and a psychological evaluation report dated December 18, 2009. This evidence does not warrant a "sixth-sentence remand."

As a threshold matter, Mrs. Washington acknowledges that the 2008 IEP does not constitute *new* evidence. Rather than demonstrating good cause for her failure to produce this document in a timely fashion, Mrs. Washington faults the ALJ for not assisting her in developing the record. This argument is unavailing. At the hearing, the ALJ strongly encouraged Mrs. Washington to obtain additional evidence, in particular given that the record lacked documentation dated prior to 2007. (Tr. 48, 50-51.) In addition, the ALJ made clear that he would leave the record open for two weeks in order to allow her to file additional evidence. (Tr. 24, 52.) He even suggested that Mrs. Washington would be afforded more time provided a timely request for extension of time was filed. (*Id.*) In accordance with the ALJ's instructions, Mrs. Washington submitted the letter of Mrs. Batista and Mr. Wilkinson after the hearing. (Tr. 337.) She did not, however, submit the 2008 IEP.

Even assuming that Mrs. Washington could establish good cause for failing to submit the 2008 IEP in a timely fashion, she cannot show that the newly proposed evidence "might have changed the outcome of that proceeding." *Finkelstein*, 496 U.S. at 626. Although the proposed evidence indicates that J.W. remains in special education program, that circumstance was fully known by the ALJ.

Far from supporting a different outcome, the 2008 IEP and the 2009 IEP actually corroborate the ALJ's finding of a less than marked limitation in attending and completing tasks. The 2008 IEP states that J.W. "completes all assignments and is making progress in his currant [*sic*] setting." It also states that, although J.W. has serious difficulties with reading and spelling, "he has strong comprehension skills." For its part, the 2009 IEP indicates that J.W. has "a specific learning disability that impacts his attention and organizational skills." Despite this disability, the report states that J.W. "consistently completes classwork."

Neither does the 2009 psychological evaluation report suggest that the ALJ's decision might have been different had that report been before him. While the 2009 psychological evaluation report provides that J.W.'s "global cognition continues to lie within the average to low average range of intellectual potential," it also indicates that J.W. "has demonstrated the abilities to successfully process and retain information through all learning

channels." Accordingly, the proposed evidence does not support a sixth-sentence remand under 42 U.S.C. § 405(g).

### IV. CONCLUSION

For the reasons set forth more fully above, I conclude that "substantial evidence" supports the determination by the Commissioner, through the ALJ, of J.W.'s disability. Consequently, I GRANT the Defendant's motion for an order affirming the decision of the Commissioner (Dkt. No. 15.) and DENY Plaintiff's motion for an order reversing that decision (Dkt. No. 13.).


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE